**Philip Hinson**

| | |
|---|---|
| **From:** | Sean Herrmann <sean@vankampenlaw.com> |
| **Sent:** | Thursday, June 7, 2018 9:38 AM |
| **To:** | Philip Hinson |
| **Cc:** | Kevin Parsons; Josh Van Kampen; Kevin Murphy |
| **Subject:** | Patel Amended Complaint Draft |
| **Attachments:** | 1806__ plaintiff - Final draft amended complaint (patel).docx; 1806__ plaintiff - Final draft amended complaint (patel).pdf |

Phil,

I hope that you are doing well. Please find attached Word and PDF copies of our draft amended complaint in the Patel matter. The revised/new paragraphs are 1, 59-73, 138-141, and paragraph 2 in the prayer for relief. Please let us know if you consent to us filing this amended complaint by close of business Monday.

I'll be out of the office from now until Tuesday, so please communicate directly with Kevin or Josh if you have any questions.

Best,

Sean F. Herrmann | Esq.
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
sean@vankampenlaw.com
www.vankampenlaw.com



North Carolina Employment Attorneys | Van Kampen Law
Our employment lawyers in North Carolina exclusively practice plaintiff-side employment law, including harassment cases and discrimination in the workplace.
Read more...





EXHIBIT

_A_



STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO. _____

MANISH P. PATEL, M.D,                        )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )
                                             )
CAROLINA   UROLOGY   PARTNERS,   )
PLLC,  TODD  D.  COHEN,  M.D.,   )
ROBERT L. WATERHOUSE, M.D., and  )
KATHERINE HARPER,                            )
                                             )
                    Defendants.              )
                                             )

**<u>AMENDED COMPLAINT</u>**

**JURY TRIAL DEMANDED**

## I.      INTRODUCTION

1. Manish P. Patel, MD, FACS, FPMRS ("Dr. Patel" or "Plaintiff") now brings actions

for: wrongful discharge in violation of North Carolina public policy against Carolina Urology

Partners, PLLC ("Carolina Urology" or the "Company") (Count I); tortious interference with

contract against Defendants Todd D. Cohen, MD, Robert L. Waterhouse MD, and Katherine

Harper (Count II), malicious prosecution against all Defendants (Count III); conversion and

trespass to chattels against Defendants Carolina Urology and Dr. Cohen (Counts IV and V);

negligent misrepresentation against Defendants Carolina Urology and Dr. Cohen (Count VI);

fraud against Defendants Carolina Urology and Dr. Cohen (Count VII); intentional infliction of

emotional distress against all Defendants (Count VIII); civil conspiracy against Defendants

Cohen, Waterhouse and Harper (Count IX); and violation of the anti-retaliation provision of the

False Claims Act, 31 U.S.C. §3730(h) (Count X).

## II.  PARTIES, JURISDICTION, AND VENUE

2. Plaintiff is a resident of Mecklenburg County, North Carolina.

3. Defendant Carolina Urology Partners, PLLC is a North Carolina Limited Liability Corporation with its principal place of business located in Huntersville, Mecklenburg County, North Carolina.

4. Defendant Todd D. Cohen, M.D. ("Cohen") is a resident of Mecklenburg County, North Carolina and Chief Executive Officer of Carolina Urology.

5. Defendant Robert L. Waterhouse, M.D. ("Waterhouse") is a resident of Mecklenburg County, North Carolina and Senior Partner and Medical Director of Carolina Urology.

6. Defendant Katherine Harper ("Harper") is a resident of Cleveland County, North Carolina and a medical assistant with Carolina Urology.

7. Plaintiff seeks damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

8. Venue is proper in Mecklenburg County Superior Court pursuant to N.C. Gen. Stat. § 1-79(a)(1)-(2) and N.C. Gen. Stat. § 1-82.

## III.  FACTUAL STATEMENT

### A.  <u>General Background</u>

9. Dr. Patel is a board certified Urologist and Female Pelvic Medicine and Reconstructive Urogenital Surgeon. He is believed to be one of only two physicians so certified in Mecklenburg County and the surrounding North Carolina counties of Gaston, Cleveland, Lincoln, Iredell, and Union, and the surrounding South Carolina counties stretching south from Charlotte, North Carolina to Columbia, South Carolina. He is a highly respected physician,

2

author, consultant, and expert witness in his field, but most importantly, a physician dedicated to his patients, referrals, and communities. He has been at all times his patients' advocate.

10. Dr. Patel knew in high school that he would pursue a career in health sciences. He had an exceptional aptitude for critical thinking and problem solving and wanted to apply himself to helping others achieve better lives through medicine. Dr. Ram Shah, a cardiologist and long time friend of Dr. Patel's father, was an enormous influence on him. Dr. Shah was a brilliant man in medicine but suffered mightily with his own health. He would talk to Dr. Patel about the wonders of medicine and the satisfaction of helping heal the sick. Moreover, he provided purpose behind Dr. Patel's passions. Dr. Patel accepted admission to Rutgers University's College of Pharmacy instead of the traditional pre-med route, because he wanted to practice with a greater depth of knowledge.

11. After graduating from Rutgers University's College of Pharmacy, earning a Bachelor's of Science in Pharmacy, and becoming board certified to practice as a pharmacist by the New Jersey Board of Pharmacy, Dr. Patel worked for one year while awaiting his future wife's graduation from Rutgers. During that year, Dr. Patel took the MCAT and gained admission to medical school. Dr. Patel chose to attend Wright State University's School of Medicine, because he had a very close relative living there, and it afforded him the opportunity to teach as a teaching assistant since he had already fulfilled many of the courses.

12. Dr. Patel graduated from medical school at the top of his class and amassed many awards of excellence in medicine, including the Alpha Omega Alpha medical honor fraternity. These accomplishments helped Dr. Patel obtain his first choice in residency: the University of North Carolina at Chapel Hill. Dr. Patel's time at UNC Chapel Hill was hard work, fun, and

3

incredibly fulfilling medically. It was at UNC that Dr. Patel decided to pursue an interest in Reconstructive Urology in men and women. Dr. Patel was under the mentorship of Culley C. Carson, III, M.D., Chairman of the Department of Urologic Surgery.

13. During residency, Dr. Patel and his wife felt like Charlotte would be a great place to raise their future family, and that is what they did. Dr. Patel and his wife live in Ballantyne where they raise twelve-year-old twins. Charlotte has also been a spiritually enriching city for the Patels; there are several Hindu and Buddhist temples of worship they frequent.

**B.      Dr. Patel's Employment with Carolina Urology.**

14. After graduation, Dr. Patel took a job with Piedmont Urology, a small two-person practice in Gastonia, North Carolina, which is when he began working with Todd D. Cohen, M.D. Dr. Patel worked there from 2002 to 2011 until a large multi-city merger led by Dr. Cohen brought him into Carolina Urology.

**1. Dr. Patel was an employee of Carolina Urology.**

15. Beginning in October 2010, Dr. Patel started working for Carolina Urology. As a condition of employment, Dr. Patel was required to sign a Physician Member Services Agreement ("SA") and Operating Agreement ("OA"), which he signed on October 10, 2010 and November 1, 2010, respectively (collectively, the "Agreements"). The Agreements were drafted at Dr. Cohen's direction by his attorney, Stephen H. Cohen ("Attorney Cohen"). The terms were non-negotiable. Prior to signing the Agreement, Dr. Patel expressed concerns about the complete lack of job protections from termination; Dr. Cohen assured him, "you'll never be fired," but refused to modify the salient language.

4

16. Carolina Urology has a traditional corporate structure. At the helm since its inception has been its Chief Executive Officer, Dr. Cohen. The Company also has the equivalent of a board of directors, called the Board of Managers (the "Board"). Dr. Cohen also served as Chairman of the Board.

17. Carolina Urology in turn engages physicians who are "members" to "practice medicine for the benefit of the Company within one of the Company's 'divisions' and to "exclusively devote the Physician's entire professional time and best efforts to the business of the Company . . ." The Company provides them access to a practice site and provides equipment, supplies, and staff. The Company provides the physician fringe benefits that are also available to non-physician employees, as well as professional liability insurance. The Company also reimburses physicians for expenses. Under the Agreements, no member is personally liable for any debts or liabilities of the Company, just like in a traditional employer-employee relationship.

18. Dr. Patel was one of approximately thirty-one (31) "members" in Carolina Urology. The members had very little ultimate control. In fact, the Agreements expressly prohibited members from taking part in the management of the Company or transacting business for the Company. Members also lacked authority to bind the Company. What little authority Dr. Patel did have as a physician member was so diluted that he could not move the needle on anything of substance within the organization. Rather, physicians were obligated to follow the instructions of the CEO from A to Z, just like any other staff member.

19. In addition, virtually every aspect of the physicians' practice of medicine was controlled by the Company:

a. The Company has the exclusive right to determine who the physician saw as patients;

b. The revenues the physician generated belonged to the Company and the Company was responsible for billings and collections; and

c. The physician agrees that the Company will be the sole compensation he receives for medical practice.

20. The physicians were likewise subject to a raft of rules, including a company manual, and were required to adhere to policies and procedures and be bound by the Company's peer review and quality improvement program.

21. The control the Company exercised even extended after a physician was terminated. All property in the physician's possession belongs to the Company, including all medical records. The OA also imposed a non-compete provision that told the physician where he could and could not work after termination.

22. Virtually all the authority rested in the hands of the Chief Executive Officer and (in theory, but not practice) the Board. The Chairman has general and active supervision over the business and affairs of the Company, subject only to the Board. In practice, the Board was merely an extension of Dr. Cohen's corporate dominance. There were very few things in the overall operation of the Company for which Dr. Cohen needed to secure Board approval. Even in those narrow instances, the Board was a rubber stamp, because the Board members were subject to removal without notice.

23. As a result of his unchecked authority, Dr. Cohen selected what portions of the Agreements he wanted to abide by and which he did not. For example, according to the OA, the Secretary is supposed to take minutes, and the position is only open to a physician. Dr. Cohen

6

had the CFO Timothy Roche (a non-physician) do so. Similarly, the OA requires that the Company have a physician treasurer who is responsible for finances; in reality Dr. Cohen had Mr. Roche perform those duties as well.

**2. Dr. Patel was an at-will employee.**

24. The Agreements offered no actual protections from termination; Dr. Patel and other physician members like him were terminable at Carolina Urology's will and without financial consequence.

25. Just like in the typical at will setting, Carolina Urology retained the right to terminate the physicians "without cause," which means for any reason, even an arbitrary reason. Not only that, Carolina Urology was not obligated to pay severance or other monetary compensation for terminating the physician without cause. Likewise, although the SA provided for a 30-day written notice period, the provision also states that the Board may accelerate the termination date in its "sole discretion." In other words, the 30-day notice period is optional. In the event that the termination is "accelerated," the SA does not obligate Carolina Urology to compensate the doctor for providing insufficient notice.

**C.  Dr. Patel was one of Carolina Urology's best and most renowned doctors.**

26. Although Dr. Patel never attained any substantive corporate officer position, he was undoubtably one of the Company's most sought after and renowned doctors. Dr. Patel's services were widely sought by patients in the community for both general urology and his expertise in Female Pelvic Medicine and Reconstructive Urogenital Surgery. As such, Carolina Urology referral staff routinely asked Dr. Patel to open up his schedule on off days in order to

7

accommodate the number of patients requiring his care. Indeed, Dr. Patel had patients travel from as far as 150 miles away so that he could be their surgeon.

27. Dr. Patel has also garnered a national and even international reputation in the field of Female Pelvic Medicine and Reconstructive Urogenital Surgery. Unlike most if not all his former colleagues, prestigious medical schools have repeatedly invited Dr. Patel to teach their residents, often covering his traveling expenses. Indeed, as recent as the weekend of May 21, 2016, Dr. Patel taught reconstructive surgery to residents at Stanford University. Dr. Patel even gave the keynote lecture at the Italian Euro Reconstructive Meeting in Catania, a city on the east coast of Sicily, Italy. Dr. Patel was also the most published physician at Carolina Urology. During his employment, Dr. Patel presented or authored papers and abstracts approximately 50 times or more and authored medical text book chapters.

**D.**     **Dr. Patel discovers apparent widespread medical malpractice and insurance fraud.**

28. Dr. Patel's medical career was seemingly approaching its zenith by the end of 2014, when he began discovering rampant private and government insurance fraud and violations of North Carolina and South Carolina Medical Board standards. Although it was the role of the Treasurer, Chief Financial Officer and/or other Corporate Officer to prevent and remedy insurance fraud, Dr. Patel uncovered multiple instances of apparent insurance fraud in his individual capacity as an employee. As a result, he began specifically investigating insurance fraud. He ultimately came to believe in good faith that several physicians defrauded private and government insurers for unnecessary or incomplete procedures or tests. Some examples of such activity he discovered and sought to remediate are listed below.

8

d. Some physicians routinely ordered more expensive creatinine urine tests than were not medically necessary.

e. Some physicians routinely ordered medically unnecessary CT scans, with some patients undergoing numerous CT scans in a single year.

f. One corporate officer billed for a cystoscopies that he did not fully perform. A cystoscopy is a procedure where a urologist inserts a light scope into the urethra to look inside the bladder for tumors, stones, or abnormal changes in the lining of the bladder. Such a test takes Dr. Patel four to five minutes to complete on a patient. Nurses reported that this corporate officer was simply inserting the scope and quickly removing it in under thirty seconds, which is not nearly enough time to conduct the examination. The corporate officer nonetheless billed insurance for these procedures.

g. Another physician at Carolina Urology's location in Concord, North Carolina, routinely ordered 300 units of Botox for bladder injections, when only 100 units to 200 units are medically necessary for any one procedure with 200 units being the maximum dose as determined by the FDA. This scheme allowed the physician to charge more per procedure than what was medically necessary.

h. There were also rampant problems with cloning medical records. For example, Dr. Patel discovered that a physician with whom he worked closely continuously failed to complete medical records after meeting with patients. Rather, this physician routinely re-created medical records many months after-the-fact when it would have been dubious for him to accurately recite the care provided. Such after-the-fact recreation of medical records raises serious issues about whether insurance was billed for services that were not rendered.

29. Around the same time, Dr. Patel also discovered several extremely troubling instances of apparent violations of North Carolina Medical Board standards, including but not limited to the examples below.

i. In December 2014, Dr. Patel was informed that a physician (and Board member) at one of the locations used or attempted to use a broken rectal probe in patient care. The ultrasound technician who assisted informed the doctor it was broken and unusable. The physician was angered and terminated the employee. The employee filed a wrongful termination complaint.

j. In early 2015, Dr. Patel found that a physician and board member at one of the locations informed patients with cancer that they did not have cancer or

9

misinformed them as to the type of cancer they had. In both scenarios, the mis-information could have had devastating health consequences for the affected patients.

30. On multiple occasions, both verbally and in writing, Dr. Patel formally reported these fraudulent activities to Dr. Cohen in furtherance of his effort to stop violations of state and federal law and did the same in reporting the blatant malpractice problems in accordance with the North Carolina Medical Practices Act. Dr. Patel in no uncertain terms told Dr. Cohen that the foregoing conduct constituted fraud and that it was illegal. For example, Dr. Patel informed Dr. Cohen and Board the NCMB and federal government require billed charts to be completed within a reasonable timeframe and that Medicare rules state that practitioners are expected to complete the documentation of services "during or as soon as practicable after it is provided in order to maintain an accurate medical record." He also informed them that the Center for Medicare and Medicaid Services states that providers should not add late signatures to the medical record. Dr. Patel expressed frustrations with Dr. Cohen's refusal to take remedial action and warned him that he would report the foregoing to the Medical Board and that he anticipated that the Medical Board would in turn direct him to report the fraud to Medicare in which case he would do so. Dr. Cohen correctly viewed Dr. Patel's activity as a threat to initiate legal action and threatened "if you report any of this, you'll pay for it. What's wrong with you fucking Indians."

31. It should come as no surprise that Dr. Cohen protected the culpable physicians. In addition to apparent over billing for services he did not render, Dr. Cohen also demonstrated dubious ethics in connection with a malpractice lawsuit that was filed against him by a former patient. On the eve of Dr. Patel's deposition in the matter, Dr. Cohen threatened him that he

10

would be terminated if he testified to anything damaging to him and instructed him to lie if necessary.

**E.    Carolina Urology seized on a pretextual basis to terminate Dr. Patel rather than correct the serious issues Dr. Patel reported.**

**1. Dr. Patel's management of a problem employee, Katherine Harper.**

32. In the spring of 2015, Dr. Patel was managing poor performance and misconduct issues with Medical Assistant Katherine Harper. For example, Ms. Harper repeatedly: (1) left Dr. Patel with undressed and exposed female patients in exam rooms, (2) did not tag charts properly, and (3) made many errors tracking her work hours that required correction.

33. Dr. Waterhouse repeatedly came to Ms. Harper's defense and even threatened to resign if Ms. Harper was terminated.

34. Dr. Patel went to extraordinary lengths to help remediate Ms. Harper's performance and conduct issues. For example, Dr. Patel took her to a research seminar in Minneapolis at his own expense and bought her the books she needed to obtain her CMA license.

35. Ms. Harper continued to have egregious performance issues. For example, on or about April 24, 2015, Ms. Harper discarded vital surgical supplies (neuro-electrodes) with a patient on the procedure table with two 3.5 inch spinal needles in her spine. Dr. Patel had to abort the procedure and start over again later in the afternoon. The patient's family was understandably upset with the patient having to undergo a second procedure.

36. The day of April 28, 2015 was a particularly bad day for Ms. Harper. That day, she twice left the exam room while Dr. Patel was conducting a vaginal exam, and she broke the sterile field when she dropped a sterile item on the floor and picked it up with a dirty glove and

continued to use the glove. She also ignored Dr. Patel's repeated requests from the exam room for her to retrieve samples from the lab. As a result, at approximately 3:00 p.m., Dr. Patel had to leave a female patient and go to the lab room where he encountered Ms. Harper chatting with a colleague. Dr. Patel previously instructed Ms. Harper to be available in the hallway to assist physicians and had specifically told her to stop socializing in the lab. Dr. Patel accidentally bumped into Ms. Harper as he was retrieving the sample. Ms. Harper did not fall, cry out, or indicate that she was injured in any way, nor (upon information and belief) did she seek medical care for any injuries she sustained.

37. Later that day, Dr. Patel talked with Dr. Waterhouse and reiterated his intent to terminate Ms. Harper by the end of the week. Dr. Waterhouse once again asked Dr. Patel to wait until he could talk to Ms. Harper; Dr. Patel reluctantly agreed. Subsequently, Dr. Patel finally drew a line in the sand and said he would terminate Ms. Harper when he returned from Florida on or about May 20, 2015. He never got the chance.

38. On May 7, 2015, *more than a week after* the encounter and after Dr. Patel conveyed the final decision to terminate, Ms. Harper apparently reported the unremarkable April 28th encounter to the Charlotte-Mecklenburg Police Department.

39. On May 15, 2015, *more than two weeks after the encounter*, Ms. Harper then went to the Mecklenburg County District Court magistrate and obtained a misdemeanor criminal summons. The summons accused Dr. Patel of "grabbing [her] by the shoulder, digging in his fingers, and shoving out of the way so hard that she lost her balance."

40. Ms. Harper's conspicuously timed police activity ultimately resulted in Dr. Patel's termination and saved her job.

12

## 2. Carolina Urology suspends and eventually terminates Dr. Patel.

41. The very same day that Ms. Harper obtained the criminal summons, Dr. Patel received an email regarding an emergency board meeting. Dr. Patel was in Florida and called Dr. Cohen who informed him that Ms. Harper had filed misdemeanor charges against him. Suggesting collusion and coordination, Dr. Cohen seemingly knew about the criminal summons *the same day* Ms. Harper obtained it and before Dr. Patel was served. Resolving any doubt, Dr. Waterhouse later admitted to Dr. Patel that he told Ms. Harper to file the charges.

42. On May 20, 2015, Dr. Patel flew back and met with Dr. Cohen and Attorney Cohen; they informed him that he would be suspended for three months and instructed him to get evaluated by the North Carolina Physician Health Program ("NCPHP"). Dr. Patel protested, especially in light of his scheduled surgeries for clients with serious conditions. Many of these patients had waited for months for these procedures, which would be needlessly and in some cases dangerously delayed. Dr. Cohen and Attorney Cohen showed no concern for the patients and told Dr. Patel he needed to "get the chip off [his] shoulder" and work through his "issues." As a result, Dr. Patel's patients' surgeries were cancelled without any regard for their health or for how long they had already had to wait to get on Dr. Patel's surgical schedule. In so doing, Carolina Urology violated the North Carolina Medical Board's position on patient care. When Dr. Patel asked what would happen after 90 days, both Dr. Cohen and Attorney Cohen assured him that he would return to work and care for patients as normal.

43. A week later, Dr. Patel encountered Dr. Cohen at a restaurant; Dr. Cohen again assured him everything would be okay, and he would be returned to work after the suspension.

13

44. During the week of July 1, 2015, Dr. Patel called Attorney Cohen and inquired about his status; Attorney Cohen told Dr. Patel that he liked that Dr. Patel was taking the matter seriously and did not see any problem with his returning.

45. Dr. Patel detrimentally relied on these promises and did not obtain other employment.

46. Dr. Patel fully participated in the NCPHP program even though his participation was not required by NCPHP. Dr. Patel was under no restriction to return to work.

47. Yet, on July 16, 2015, Attorney Cohen called and informed Dr. Patel that the Company terminated him "without cause."

48. On or about August 7, 2015, Dr. Patel received a letter also stating that he was terminated without cause.

49. By all accounts, Carolina Urology never intended to bring Dr. Patel back.

**F.      Adding insult to injury, Defendant Carolina Urology refuses to return Dr. Patel's personal property.**

50. After his termination, Dr. Patel requested to travel to the office and pick up his personal effects. Carolina Urology refused to grant him access and insisted on shipping his belongings to him.

51. Dr. Patel personally purchased four Carolina Panthers' Property Seat Licenses (section 313 row 21, seats 5-8) and the accompanying tickets for the 2015-2016 season. That season's face value for those particular tickets was $11,640.24. The Carolina Panthers mailed the foregoing tickets to Dr. Patel at Carolina Urology's office at 924 Cox Road in Gastonia, North Carolina and (upon information and belief) that is where they remained during all

14

relevant times. Dr. Patel did not authorize Defendants to use the foregoing tickets. Carolina Urology never returned them to Dr. Patel and (upon information and belief) utilized them.

52. Defendants also failed to return gold plated coins that Dr. Patel's mother gave to him as Hindu rites of passage when he left home as a young man. These coins were in a locked drawer in Dr. Patel's office. Dr. Patel also had a statute of Ganesh (a Hindu deity) in his office. There is a religious ritual for transporting the deity, which Dr. Patel explained to Carolina Urology when he asked to come to the office. Instead, Carolina Urology desecrated the statute by burying it under several books in a box.

53. Dr. Patel repeatedly requested that Dr. Cohen and Carolina Urology return the foregoing missing items, but they refused and likewise have not paid Dr. Patel for their value.

**G.** **The trumped up criminal charge is thrown out without Dr. Patel even having to present a defense.**

54. The criminal hearing did not go well for Harper and the other Individual Defendants. In her sworn testimony, Harper contradicted the earlier sworn statements she made to cause a warrant to be issued; admitting that her earlier sworn statements were untrue. Harper acknowledged that the lab was very tight quarters for the number of people that were in the room at the time Dr. Patel bumped into her. Harper further testified that she did not even know who bumped into her, as her back was turned and everyone in the room was about the same distance from her when she turned. And one of Harper's own witnesses, Briana Bost, testified she didn't see anything. At the close of the State's case, the Honorable Charlotte Brown-Williams dismissed the charges against Dr. Patel without requiring any evidence from the defense. To make this rare ruling, the court must assume facts in the State's favor. Even doing

15

so, Judge Brown-Williams held that Dr. Patel was not guilty and dismissed the case against him.

One of Carolina Urology's's civil attorneys was there to watch the dismissal.

**H.    Carolina Urology's also had a discrimination problem and that likely also factored into Dr. Patel's termination as well.**

55. Dr. Cohen and others at the Company repeatedly made comments that demonstrated bias against minorities:

a.  In or around September 2014 and again in January 2015, Dr. Cohen told Dr. Patel to "whiten up" the Ballantyne office. Dr. Patel opposed his direction to discriminate and responded, "we're picking the best from the candidate pool sent to us." Dr. Cohen did inform the management staff of the comment but asked them to do what was in the best interest of the division.

b.  On or about April 2015, Dr. Cohen said to Dr. Patel, "what's wrong with you fucking Indians?"

c.  On more than one occasion over his last year of employment, Dr. Patel was forced to tolerate racist or biased remarks from my peers. He was called a terrorist and turban head by a Carolina Urology physician at the Company's yearly meeting on or around February 2015. Additionally, Dr. Patel was called 7-11 owner and hotel worker and was mocked with the use of the Indian accent, and subjected to statements such as "all you fucking Indians stick together." When Dr. Patel did complain to Dr. Cohen, Tim Roche referred to me as a "problem employee."

d.  Nurse Katherine Harper also commented negatively about Dr. Patel's religion. She said that as a Christian she believed my religion was a path to hell. Specifically, she said, "as a Christian, we believe that is a path to hell you are on."

56. Carolina Urology's hostility toward Plaintiff's race, color and religion is also evidenced by how Carolina Urology desecrated several of his religious items and misappropriated irreplaceable personal items outright.

57. Carolina Urology held Dr. Patel to a higher performance standard than others physicians outside his protected categories as evidence by how Carolina Urology shielded the various physicians about whom Dr. Patel complaint.

58. Upon information and belief, Dr. Patel was replaced in the Division by a white physician's assistant.

**I.** **Dr. Patel complained about fraud on the government.**

59. Dr. Patel also repeatedly complained to Defendants that he believed they were defrauding the federal government through Medicare and Medicaid.

60. In fact, Dr. Patel was so concerned with Defendants' fraud that in 2013 he provided a document to Defendant Cohen listing and describing approximately 15 types of medical billing fraud, which included, but was not limited to: upcoding, cloning, phantom billing, self-referrals, cancelled service, no medical value, standard of care, and unnecessary treatment. He did this in response to what he was observing at the practice. These types of billing fraud are generally characterized as follows:

    a. "Upcoding" is when a provider submits a claim for a service more severe or substantial than that actually provided to the patient.

    b. "Cloning" occurs when a system automatically generates a more detailed patient observation profile by copying from another patient's file with similar symptoms to appear as if a more thorough examination took place. Medical record cloning is highly suspect and was rightfully a giant red flag for Dr. Patel. The practice is problematic because earlier visits would typically carry more "points," which allow bills to be higher. When providers blindly carry

17

those points forward, it allows them to bill the government (and private insurers, as well) for services that were not actually provided.

c. "Phantom billing" takes place when patients are simply billed for services that were never performed.

d. "Self-referrals" are problematic because providers benefit financially from referring his or herself or his or her partner to perform a service.

e. "Cancelled service" happens when a service that the patient stopped receiving is still being billed to the patient.

f. "No medical value" describes a situation where claims are submitted for payment for poor service that resulted in a decline in the patient's health.

g. "Standard of care" violations happen when the provider bills for services that did not meet the quality standards of care.

h. "Unnecessary treatment" is extremely common and takes place when providers provide and bill for unnecessary tests.

61. During his time with Defendants, Dr. Patel detected what he believed in good faith to be billing offenses and repeatedly complained about them. Specifically, he told Defendant Cohen, Roche, and others.

62. For example, Dr. Patel noticed that providers at Lake Norman Urology were billing ultrasounds and imaging at an astounding and irrational rate, and one that meant they were being almost certainly being used, and billed for, when medically unnecessary. Dr. Patel complained to the Board approximately five or six times that this was likely fraud on the federal

18

government from 2013 through 2015. He also individually went to Cohen, Roche, Dr. Buzzeo and HR Director Courtney Claire.

63. Right before CUP terminated Dr. Patel, he emailed Dr. Cohen and CUP's quality control committee, and reported what he believed in good faith to be fraud by Dr. Lamb, Dr. Lipsick, and Dr. Sweazy.

64. Dr. Patel also discovered that Dr. Scott Swayze in West Columbia, South Carolina was apparently testing for urine creatinine unnecessarily.

65. Similarly, Dr. Patel discovered that certain CUP doctors were billing for an unusually high and disproportionate number of CT scans, which Dr. Patel believed in good faith to be largely medically unnecessary. Prior to his termination, he complained about this to the Board and Cohen and Roach, individually.

66. Dr. Patel also uncovered apparent Botox fraud. He discovered 300 units of botox being delivered to patients in CUP's Columbia, South Carolina area office, which was wildly outside the standard, and Dr. Patel saw this used on an incredible number of patients. Dr. Patel complained to the board and the quality committee about this.

67. Dr. Patel further noticed that Dr. Waterhouse was closing charts months after his encounters with the patients. This practice is suspect because there is no reliable way for a physicians to accurately recall specific services provided to the patient given the passage of time, and it allows physicians to manipulate the records as they see fit after the fact. This can lead to upcharging patients and ultimately Medicare or Medicaid for services that they did not actually received.

19

68. Dr. Patel complained repeatedly about this practice, but his concerns were, to his knowledge, never addressed.

69. Dr. Patel also complained that certain providers were cloning medical records, which he believed in good faith to be a pervasive problem at CUP.

70. Dr. Patel also complained about apparent provider violations of the Anti-Kickback Statute. For example, Dr. Cohen insisted that members only use the Prolaris study for prostate cancer. In fact, Dr. Cohen once went so far as to ban representatives from a competing company from visiting CUP offices. Dr. Patel voiced these concerns while he was still employed there.

71. Dr. Patel also complained about apparent violations of the Physician Self-Referral Law, which prohibits physicians from referring certain designated health services payable by Medicare or Medicaid to an entity in which the physician has an ownership interest or compensation arrangement. Dr. Patel witnessed these apparent violations, and he reported those violations to CUP.

72. Dr. Patel attended multiple board meetings and complained about what he viewed in good faith to be Medicare and Medicaid fraud at each of those meetings. The last board meeting at which Dr. Patel complained about government fraud was between February and April 2015.

73. Dr. Patel's complaints drew hostility from Defendants. He was told to keep quiet and when that didn't cow him, Defendant Cohen outright threatened to fire him if he didn't stop complaining.

**J.** **Harms and Losses.**

74. Defendants' unlawful conduct has had devastating consequences on Dr. Patel's career. Dr. Patel was unemployed for many months and ultimately had to accept a position for a health care system in another city where he makes substantially less money than he did with Carolina Urology. Dr. Patel also lost a Charlotte area patient base he had painstakingly amassed over a dozen plus years of practicing in the Charlotte area. That patient base was a behemoth revenue driver for himself and Carolina Urology. After being wrongfully terminated, Dr. Patel had to start his career over in a city where he was largely an unknown among prospective patients.

75. Dr. Patel has also suffered severe emotional distress. He has experienced an array of symptoms consistent with depression and/or anxiety including but not limited to: considerable difficulty sleeping, fatigue, loss of enjoyment, decreased socializing, sadness, anger and ruminating thoughts. There were also physical manifestations including, but not limited to: weight gain, chronic pain in the upper back and neck, and headaches.

76. Dr. Patel has also paid a heavy price with respect to his family. He now sees his wife and children a fraction of the time compared to when he worked for Carolina Urology. Dr. Patel typically spends multiple days a week away from the family home and countless hours driving back and forth to work.

## IV.     LEGAL CLAIMS

**Plaintiff's First Cause of Action**
*Wrongful Discharge in Violation of North Carolina Public Policy*
*(Against Defendant Carolina Urology)*

77. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

78. Plaintiff was an at-will employee.

79. Defendant Carolina Urology terminated Plaintiff's employment in violation of North Carolina public policy, as outlined in the North Carolina Medical Practices Act, N.C. Gen. Stat. § 90-1 *et seq.,* including § 90-14(a) (empowering the North Carolina Medical Board to discipline physicians for immoral or dishonorable conduct, unprofessional conduct, for making false representations for money and lack of professional competence) and § 90-14(f) (protecting persons who in good faith report, investigate, assess, or monitor acts or omissions of a medical professional that violate the provisions of § 90-14(a) or any other provision of law relating to the fitness of a licensee or applicant to practice medicine). Said public policy is also outlined in a North Carolina Medical Board Position Statement, which provides that, "licensees have a professional obligation to act when confronted with an impaired or incompetent colleague or one who has engaged in unethical conduct."

80. Defendant Carolina Urology also terminated Plaintiff's employment in violation of North Carolina public policy as outlined in: the North Carolina Insurance Law, N.C. Gen. Stat *§ 58-1-1 et seq.*, North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat § 75-D1, and the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1.1 *et seq.*

81. Defendant Carolina Urology terminated Plaintiff for investigating and making good-faith complaints and reports of misconduct by his colleagues that ran afoul of the foregoing statutes and for threatening to make external complaints regarding said conduct. These complaints and reports directly affected patient well being.

22

82. The public policy of the State of North Carolina, as set forth in N.C.G.S. § 143-422.1 *et seq.*, North Carolina's Equal Employment Practices Act, prohibits employers from discriminating against employees on the basis of race, religion, color and national origin. Defendant Carolina Urology also violated North Carolina public policy by terminating Plaintiff on those bases.

83. Defendant Carolina Urology's actions actually and proximately caused Plaintiff damages. As a proximate result of Defendant Carolina Urology's wrongful conduct, Plaintiff has suffered lost wages, severe emotional distress, anxiety, humiliation, and damage to his reputation and is entitled to recover compensatory damages.

84. Defendant Carolina Urology's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

**Plaintiff's Second Cause of Action**
***Tortious Interference with Contract***
***(Against Defendants Dr. Waterhouse, Dr. Cohen, and Katherine Harper)***

85. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

86. Plaintiff had an at-will employment contract with Defendant Carolina Urology.

87. Dr. Cohen, Dr. Waterhouse, and Ms. Harper ("Individual Defendants"), without justification, maliciously induced Carolina Urology to terminate its at will employment contract with Plaintiff.

88. Individual Defendants acted with design to injure Plaintiff and to gain an advantage at his expense. Specifically, Individual Defendants interfered with Plaintiff's at will employment contract with Carolina Urology in an effort to retaliate against him for his lawful

23

whistleblowing activity, discriminate against him based on his race, color, religion or national origin to vindicate their personal vendettas against him, and/or for their own financial gain. Individual Defendants' means and motives for interfering with Plaintiff's at will contract were improper, wrongful and exceeded their legal rights and authority. Individual Defendants acted for their own benefit in interfering with Plaintiff's at will contract, rather than in the best interest of Carolina Urology.

89. Individual Defendants' actions actually and proximately caused Plaintiff damages. As a proximate result of their wrongful conduct, Plaintiff has suffered lost wages, severe emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

90. Individual Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

**Plaintiff's Third Cause of Action**
***Malicious Prosecution***
***(Against all Defendants)***

91. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

92. Defendant Harper initiated criminal process against Plaintiff for ulterior and improper purposes, including but not limited to: deterring and preventing him from terminating her, retaliating against him for attempting to terminate her, assisting Defendant Carolina Urology's unlawful conduct by giving it a pretext to suspend and ultimately terminate Plaintiff, damaging Plaintiff's reputation, and/or to otherwise coerce, harass, and intimidate him from engaging in

24

lawful conduct. In doing so, Defendant Harper misused the criminal process for an end for which the criminal process was not designed to accomplish.

93. Defendant Carolina Urology, Dr. Waterhouse, and Defendant Cohen participated in and/or condoned the malicious, willful, wanton, and reckless conduct alleged above. Dr. Waterhouse admitted that he encouraged Ms. Harper to initiate the criminal process, which implicates not only himself, but Dr. Cohen and CUP as a whole. Defendant Carolina Urology, Dr. Waterhouse, and Defendant Cohen are responsible for Defendant Harper's actions through the doctrines of respondent superior, ratification, and agency. Defendant Harper's tortious actions arose from an event at one of Defendant Carolina Urology's buildings and while Defendant Harper was acting within the scope of her employment. Defendant Harper acted in furtherance of Defendant Carolina Urology, Dr. Waterhouse, and Defendant Cohen's wrongful purpose, which was to suspend and terminate Plaintiff in retaliation for his whistleblowing activity. Defendant Carolina Urology, Dr. Waterhouse, and Defendant Cohen ratified Defendant Harper's conduct as evidenced by their decision to retain her despite grievous performance issues and by ultimately suspending and terminating Plaintiff with actual or constructive knowledge that her allegations were grossly exaggerated and/or false.

94. Defendants lacked probable cause to institute such criminal proceedings against him. The criminal proceeding terminated in Plaintiff's favor, as the court threw the charges out after the state's evidence was complete.

95. Carolina Urology's officers, directors, and managers otherwise participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is responsible for Cohen, Waterhouse, and Harper's actions through the doctrines of respondent

superior, ratification, and agency. Furthermore, Dr. Cohen is the alter ego of Carolina Urology. Cohen, Waterhouse, and Harper's actions were committed at Carolina Urology's principal place of business while Cohen, Waterhouse, and Harper were working within the scope of their employment and in furtherance of Carolina Urology's business. Cohen and Waterhouse expressly authorized these actions on behalf of Carolina Urology. Carolina Urology ratified Cohen, Waterhouse, and Harper's actions by portraying their tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its contract with Plaintiff.

96. Defendants' actions actually and proximately caused Plaintiff injury and damages. As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered lost wages, severe emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

97. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

### Plaintiff's Fourth and Fifth Causes of Action
*Conversion and Trespass to Chattels*
*(Against Defendants Carolina Urology and Dr. Cohen)*

98. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

99. Plaintiff has ownership rights to the monetary proceeds of the medical services he performed prior to his suspension and termination, as well as certain business assets of Carolina Urology including profit sharing.

26

100. Plaintiff also has an ownership right to his Carolina Panthers tickets and other personal property, including the gold plated religious coins.

101. Plaintiff requested return and payment for the foregoing ownership rights.

102. Defendants unlawfully refused these requests and in doing so wrongfully deprived and interfered with Plaintiff's possession, use, and enjoyment of said ownership rights.

103. Plaintiff did not authorize Defendants to utilize these items. Plaintiff did not authorize Defendants to withhold monetary proceeds, especially under the unlawful circumstances of his termination. Defendants did not pay Plaintiff for possession or use of the foregoing personal property.

104. Upon information and belief, Defendant Carolina Urology utilized the Panthers tickets for business purposes, including but not limited to, providing them to physicians and staff.

105. Upon information and belief, Defendants destroyed Plaintiff's personal property including the gold plated coins.

106. Defendants' actions actually and proximately caused Plaintiff damages. As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered lost income, severe emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

107. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

108. Carolina Urology's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is

27

responsible for Cohen's actions through the doctrines of respondent superior, ratification, and agency. Cohen's actions were committed at Carolina Urology's principal place of business while Cohen was working within the scope of his employment and in furtherance of Carolina Urology's business. In his role as Chief Executive Officer and Chairman of the Board, Cohen expressly authorized these actions. Carolina Urology ratified Cohen's actions by portraying his tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its contract with Plaintiff.

**Plaintiff's Sixth Cause of Action**
*Fraud*
*(Against Defendants Carolina Urology and Dr. Cohen)*

109. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

110. Defendant Carolina Urology and Defendant Cohen made false representations of material facts to Plaintiff regarding the terms and conditions of his employment, including but not limited to: (1) Defendant Cohen promising him that he could not be terminated just before inducing Plaintiff to sign the Agreements in October 2010; and (2) Defendant Cohen and Attorney Cohen promising Plaintiff that he would be back with Carolina Urology after the 90 days suspension.

111. The foregoing statements were made with the intent to deceive Plaintiff and, therefore, Defendants Carolina Urology and Defendant Cohen also reasonably calculated their statements to deceive in the manner they constructed them. They knew at the time they made these statements that they had no intention to honor these promises.

28

112. Plaintiff was in fact deceived by Defendant Carolina Urology and Defendant Cohen's fraud. Plaintiff justifiably relied upon their false representations of material fact. Plaintiff would not have accepted his position with Carolina Urology had he known the truth about these matters that they misrepresented. Likewise, Plaintiff would have begun his search for a new position 90 days sooner and thus would have secured a new job earlier had he known the truth about Defendant Cohen and Defendant Carolina Urology's intentions in May 2015. A reasonable person in Plaintiff's position would have taken as true the promises being made by Carolina Urology in light of the role Carolina Urology was promising to give to Plaintiff and the authority which the people making these promises reasonably appeared to have over Carolina Urology.

113. Plaintiff suffered damages because of this reliance. Plaintiff was terminated from his position contrary to the promises and statements of fact he was provided by Defendants. Similarly, Plaintiff suffered damages because of this reliance on Defendants' promises and statements that he would return to work after the 90 day suspension.

114. Defendants' actions actually and proximately caused Plaintiff damages. As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered lost wages, severe emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

115. Defendants' actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights.

116. Carolina Urology's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is

responsible for Cohen's actions through the doctrines of respondent superior, ratification, and agency. Cohen's actions were committed at Carolina Urology's principal place of business while Cohen was working within the scope of his employment and in furtherance of Carolina Urology's business. In his role as Chief Executive Officer and Chairman of the Board, Cohen expressly authorized these actions on behalf of Carolina Urology. Carolina Urology ratified Cohen's actions by portraying his tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its contract with Plaintiff.

**Plaintiff's Seventh Cause of Action**
*Negligent Misrepresentation in the Alternative to Fraud*
*(Against Defendants Carolina Urology and Dr. Cohen)*

117. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

118. Defendants owed Plaintiff a duty to refrain from unreasonable misrepresentations of fact regarding the terms and conditions of his employment with Carolina Urology. In choosing to recruit Plaintiff to work for and with Carolina Urology, Defendants voluntarily took on a duty to communicate honestly and to take reasonable care in the statements they communicated to Plaintiff throughout this recruiting process.

119. Defendants violated this duty by making misrepresentations of fact to Plaintiff, including but not limited to that he could not and would not be terminated and that he would be back with Carolina Urology after a 90-day suspension. Defendants did so negligently by failing to take reasonable steps to learn and communicate the truth about these matters to Plaintiff. Defendants, thus, prepared and communicated this information to Plaintiff without reasonable care.

120. Plaintiff justifiably relied upon Defendants' misstatements of fact made without reasonable care. A reasonable person in Plaintiff's position would have taken as true the promises being made by Carolina Urology in light of the role Carolina Urology was promising to give to Plaintiff.

121. Plaintiff suffered damages because of this reliance. Plaintiff was terminated from his position contrary to the promises and statements of fact he was provided by Defendants. Similarly, Plaintiff suffered damages because of this reliance on Defendants' promises and statements that he would return to work after the 90 day suspension.

122. Defendants' actions actually and proximately caused Plaintiff damages. As a proximate result of Defendants' wrongful conduct, Plaintiff has suffered lost wages, severe emotional distress, anxiety, humiliation, and damage to his reputation, and is entitled to recover compensatory damages.

123. Defendants' actions were done maliciously, willfully, wantonly, in a manner that demonstrates a reckless disregard for Plaintiff's rights and with gross negligence.

124. Carolina Urology's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is responsible for Cohens actions through the doctrines of respondent superior, ratification, and agency. Cohen's actions were committed at Carolina Urology's principal place of business while Cohen was working within the scope of his employment and in furtherance of Carolina Urology's business. In his role as Chief Executive Officer and Chairman of the Board, Cohen expressly authorized these actions on the part of Carolina Urology. Carolina Urology ratified

31

Cohen's actions by portraying his tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its at will contract with Plaintiff.

### Plaintiff's Eighth Cause of Action
*Intentional Infliction of Emotional Distress*
*(Against all Defendants)*

125. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

126. Defendants engaged in extreme and outrageous conduct toward Plaintiff that is utterly intolerable in a civilized society. Defendants' extreme and outrageous includes but is not limited to: threatening Plaintiff, subjecting him to a retaliatory hostile work environment, conspiring to pursue baseless criminal charges against him, wrongfully terminating him, defaming him, defrauding him, and committing conversion and trespass to chattels against him.

127. Defendants intended to and did foreseeably cause Plaintiff severe emotional distress by their extreme and outrageous conduct. A reasonable person in Plaintiff's position would be expected to experience such severe emotional distress in light of the serious nature of the actions Defendants brought against Plaintiff.

128. As a proximate and foreseeable result of Defendants' conduct, Plaintiff has suffered severe emotional distress, severe mental anguish and anxiety, depression, embarrassment, and humiliation, and his peace of mind has been disturbed.

129. Defendants' actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiffs' rights. As a result of their conduct, Plaintiff is entitled to recover punitive damages in an amount sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

32

130. Carolina Urology's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is responsible for Cohen, Waterhouse, and Harper's actions through the doctrines of respondent superior, ratification, and agency. Cohen, Waterhouse, and Harper's actions were committed at Carolina Urology's principal place of business while Cohen, Waterhouse, and Harper were working within the scope of their employment and in furtherance of Carolina Urology's business. In their official roles with Carolina Urology, Cohen and Waterhouse expressly authorized these actions. Carolina Urology ratified Cohen, Waterhouse, and Harper's actions by portraying their tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its at will contract with Plaintiff.

### Plaintiff's Ninth Cause of Action
*Civil Conspiracy*
*(Against Defendants Cohen, Waterhouse and Harper)*

131. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

132. Defendants Cohen, Waterhouse, and Harper made an agreement between themselves to commit the above unlawful acts against Plaintiff. Specifically, these defendants agreed to have Harper pursue baseless criminal charges against Plaintiff, while Defendants Cohen and Waterhouse defamed, defrauded, and terminated Plaintiff as an employee for opposing Defendants' unlawful activities. Defendants Cohen, Waterhouse, and Harper further agreed that the Defendants should engage in the other unlawful activities alleged in this Complaint.

133. Defendants Cohen, Waterhouse, and Harper's agreement actually and proximately caused one or more of these defendants to injure Plaintiff in an amount sufficient that subject

33

matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

134. Defendants Cohen, Waterhouse, and Harper's agreement, actions, and injury to Plaintiff were committed pursuant to a common scheme and plan. Defendants Cohen, Waterhouse and Harper coordinated their efforts for maximum impact on Plaintiff's life. While Harper was directed to pursue Plaintiff criminally, Defendants Cohen and Waterhouse concentrated their efforts on defrauding Plaintiff and ending his employment with the goal that all of these actions would have a combined multiplier effect for increased impact on Plaintiff's life.

135. Defendants Cohen, Waterhouse, and Harper's actions were done maliciously, willfully, or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiffs' rights. As a result of their conduct, Plaintiff is entitled to recover punitive damages in an amount sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

136. Defendants Cohen, Waterhouse, and Harper had an independent personal stake in achieving their illegal objectives. Specifically, these defendants had a motive to retaliate against Plaintiff for uncovering, opposing, and threatening to report their own misconduct and/or his attempts to end Harper's employment.

137. Carolina Urology's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above. Carolina Urology is responsible for Cohen, Waterhouse, and Harper's actions through the doctrines of respondent superior, ratification, and agency. Cohen, Waterhouse, and Harper's actions were committed at

34

Carolina Urology's principal place of business while Cohen, Waterhouse, and Harper were working within the scope of their employment and in furtherance of Carolina Urology's business. In their official roles, Cohen and Waterhouse expressly authorized these actions on behalf of Carolina Urology. Carolina Urology ratified Cohen, Waterhouse, and Harper's actions by portraying their tortious acts as part of both the official processes of the business of Carolina Urology and by terminating its at will contract with Plaintiff.

**Plaintiff's Tenth Cause of Action**
*Violation of 31 U.S.C. §3730(h)*
*(Against Defendants CUP and Dr. Cohen)*

138. The allegations of all paragraphs in this Complaint are incorporated by reference.

139. Plaintiff engaged in protected activity by reporting his reasonable belief that Defendants were committing fraud against the federal government and by investigating said fraud.

140. Defendants individually by and through their own acts, or through the acts of its agents, servants, officers, and employees, unlawfully retaliated against Plaintiff for engaging in protected activity in violation of 31 U.S.C. §3730(h).

141. As a result of Defendants' unlawful retaliation, Plaintiff has suffered damages in amounts to be determined at trial.

**JURY TRIAL DEMANDED**

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendants and order Defendants to pay Plaintiff compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

35

2.  Award Plaintiff liquidated damages pursuant to 31 U.S.C. §3730(h);

3.  Award Plaintiff front pay;

4.  Award Plaintiff punitive damages pursuant to N.C.G.S. § 1D-1 *et seq.*;

5.  Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

6.  Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; and

7.  Grant Plaintiff a trial of this matter by a jury.

This the ___ day of June, 2018.

 

 

_____
Joshua R. Van Kampen (NC Bar No. 32168)
josh@vankampenlaw.com
Kevin P. Murphy (NC Bar No. 41467)
kevin@vankampenlaw.com
Sean F. Herrmann (NC Bar No. 44453)
sean@vankampenlaw.com
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
*Attorneys for Plaintiff*

36